UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

WALTER L. FOX, et al.,              )
                                    )
          Plaintiffs,               )
                                    )
v.                                  )      CV 00-AR-3454-S
                                    )
COMMUNITY BANK,                     )
                                    )
          Defendant.                )

**ENTERED**

FEB - 1 2002

### MEMORANDUM OPINION

Before the court is a motion for summary judgment filed by
defendant, Community Bank.  For the reasons set forth below, the
motion of Community Bank is due to be partially granted.

### I.   STATEMENT OF FACTS

Plaintiffs, Walter L. Fox ("Fox"), Thomas Redmon, and Fox &
Redmon, a partnership ("the partnership") (hereinafter,
plaintiffs are collectively referred to as "Fox & Redmon"), filed
suit on November 30, 2000, to recover funds paid by Community
Bank out of a joint bank account on forged checks.

Fox, acting for the partnership, opened a "joint signature
account" ("the joint account") at Community Bank with Russell R.
Rhodes ("Rhodes") in May 1997.[1]  Rhodes signed the Account

---

[1]The partnership leased to Rhodes and his wife facilities for two
long-term care hospitals.  (Fox Dep. at 9.)  The partnership
leased the premises, land, building, and the equipment.  (Id. at
9-10.)  The joint account with Community Bank was opened,
according to Fox, so that the funds in the account could be used
in the repair, construction, remodeling, and maintenance of one
of those facilities, which was located in Phoenix, Arizona.  (Id.
at 15; Ellis Dep. at 18-19.)  At the suggestion of Rhodes and
without objection by Fox, Community Bank was selected as the bank
at which to open an account.  (Fox Dep. at 15.)



Agreement at the Cleveland branch.   In accordance with its procedures, Community Bank forwarded the Account Agreement to Fox in California.   Fox signed it in the presence of a notary public and returned it to Community Bank.

The Account Agreement provided:

> If you [, account holder,] do not notify
> [Community Bank] of an unauthorized signature
> or alteration within a reasonable time (not
> to exceed 14 days) after we send or make
> available to you your statement and items:
> (1) you cannot assert the unauthorized
> signature or alternation against us, even if
> we are unable to show a loss due to your
> failure, and (2) you cannot assert any
> unauthorized signature or alterations by the
> same wrongdoer on the items paid by us after
> the reasonable time mentioned above elapses,
> but before we receive your notice.   We [,
> Community Bank,] lose these protections if we
> fail to exercise ordinary care in paying an
> item with an unauthorized signature or
> alteration, unless you notify us with a
> problem within sixty (60) days of when we
> send or make available to you the statement
> and items.   You must report any other
> problems (e.g. erroneous statement or pass
> book entry, missing signature, unauthorized
> endorsement, etc.) within this sixty (60) day
> period or lose your right to assert the
> problem against us.

The Account Agreement further provides that the statements for the joint account were to be mailed to Rhodes at a post office box in Cleveland, Alabama.[2]   Furthermore, Fox understood that the statements for the joint account would be sent to that

---

[2]Fox admits that the statements were sent to the Cleveland post office box address.   (Fox Dep. at 21.)   Following its customary practices and procedures, Community Bank included each of the checks paid with the correlating statements.

post office box address.  (Fox Dep. at 21.)  As its typical

procedure regarding joint accounts, Community Bank would send

only one statement to one location, rather than to send

statements to all persons on the joint account.  (Ellis Dep. at

61.)  Fox never asked for the joint account statements to be sent

to an address other than the Cleveland post office box.  Fox

claims that, when the account was established, he asked Rhodes

for copies of the statements mailed to the post office address;

Fox also claims that Rhodes agreed to supply those statements to

him.  (Fox Dep. at 21.)  Fox admits that Rhodes provided him with

copies of statements every month, but Fox claims the statements

provided were forgeries.  (Id. at 22.)  The evidence establishes

that there are indeed two sets of statements; the numbers and

records contained in the second set differ substantially from the

first set.

The joint account was opened with an initial deposit of

$358,940.97, which was provided by the partnership.  Under the

Account Agreement, the signatures of both Fox and Rhodes were

required on checks to make them properly payable by Community

Bank.  Between November 12, 1997, and May 9, 1998, Community Bank

paid five forged checks drawn on the joint account, totaling

$325,981.05.[3]  These five checks contained the forged signature

---

[3]The first check was made payable to Southwood Management, was
presented for payment on November 12, 1997, and was written for
$74,362.47.  This check was paid by Community Bank on November
14, 1997.  The second check was presented on March 16, 1998, and
was written for $65,260.43.  Presented on April 27, 1998, the

3

of Fox.  The parties appear to agree that the signature of Fox was forged, that Fox's signature was unauthorized, and that Fox never ratified the forged signatures.[4]

Fox first became aware of the payment of the forged checks on June 30, 1998, and informed Community Bank of such.  On October 8, 1998, Fox & Redmon formally demanded that Community Bank credit the joint account with the total sum of the forged checks.  Community Bank did not then credit and still has not credited the joint account.[5]

No evidence suggests that Community Bank did not follow its standard procedures when paying the forged checks drawn on the joint account.  Once a check is presented to Community Bank, the check is sent to the "proof department" where the amount of the check is posted to the bottom of the check on what is called the

---

third check was written for $74,243,17.  The fourth check was written for $32,472.31 and was presented on April 28, 1998.  The fifth forged check was presented for payment on May 9, 1998, in the amount of $79,642.67.

[4]In a letter dated June 30, 1998, addressed "[t]o whom it may concern," Rhodes states: "I signed Walter Fox's name to the following checks: 226, 276, 251, 252, and 227 on account # 46809933 at Community Bank in Cleveland, Alabama.  The money in the account belonged to Fox and Redmon, a Partnership[.]  I did not have Walter Fox's permission to sign his name."  (Evidentiary Submission Supp. Community Bank's Mot. Summ. J. at Tab F.)

[5]Though Community Bank has not re-credited the joint account, Fox & Redmon admit that they have obtained some relief.  (Fox Dep. at 40.)  Fox & Redmon formally demanded from Rhodes the amount now sought in this action.  Fox & Redmon have obtained liens on and have subsequently liquidated properties formerly owned by Rhodes. (Id.)

4

microline.  (Ellis Dep. at 71.)  The checks are then passed through a "reader/sorter" that captures the data for the main operating computer and inputs the data into that computer.  (Id.) The accounts are then updated to reflect the debiting or crediting of the amount captured from the microline.  (Id.)  In this data processing stage, Community Bank does not follow a procedure that enables the proof department to determine if two signatures are required on the check and if the check is in compliance with such a requirement.  (Id. at 73.)

As part of its regular procedure following the presentment of a check, Community Bank does not require visual examination of the check.  (Ellis Dep. at 70.)  Community Bank does not have a procedure to determine if the signatures appearing on the check bear any relationship or resemblance to the signatures on the account card.  (Id. at 74.)  According to Kevin Ellis ("Ellis"), City President of Community Bank, before the checks are sent to the proof department, the tellers "try to look at the check before they accept it to look for-you know, see if there's two signatures."  (Id. at 73-74.)  Community Bank does not require visual examination of each check[6] because, according to Ellis,

---

[6]According to Ellis, other area banks do not follow a standard procedure to inspect for unauthorized or forged signatures, and they do not follow a procedure, upon presentment, for ascertaining whether the check contains the requisite number of signatures.  (Ellis Dep. at 86.)  His knowledge was obtained through discussions with people he knows at other banks or employees that have worked at other banks.  (Id.)

5

Community Bank operates on the assumption that the signatures on the checks are genuine. Ellis claims that this assumption can be overcome by the customer because, after receiving the statement and the corresponding cancelled checks, the customer ultimately has fourteen to sixty days to notify Community Bank of any unauthorized or forged signatures. (Id. at 70.) If an irregularity is reported within this time period, Community Bank will credit the customer's account for the disputed amount.[7] (Id. at 85.)

Rhodes, a Certified Public Accountant, was a customer of Community Bank, having deposit accounts both in his name and in the name of a corporation, Southwood Management Group ("Southwood"), that he and his wife owned. Most of these deposit accounts related to the management of nursing homes owned by Southwood.[8] (Ellis Dep. at 16-18.) In addition to having other deposit accounts at Community Bank, Rhodes was also personally

---

[7] After re-crediting the customer's account, Community Bank will then seek reimbursement from the recipient of the funds. (Ellis Dep. at 85.) Community Bank also has an insurance policy that could possibly cover any payments made by Community Bank on checks containing forged or unauthorized signatures. (Id. at 85-86). Community Bank holds this insurance policy with CHUB Insurance Group. (Id. at 86.) Community Bank has made a claim on the checks at issue, but Community Bank has not received any indication from their insurer whether the claim will be paid. (Id.)

[8] The Southwood accounts would have been included in a list of the top five largest checking accounts at Community Bank. (Ellis Dep. at 53.)

indebted to the bank under an outstanding loan relating to the aforementioned corporation.  This loan was an unsecured line of credit for $150,000; it was to be used in connection with the operations of Southwood to temporarily finance the corporation's accounts receivables.[9]  (Id. at 20, 25.)

In 1999, Community Bank attempted to secure its unsecured line of credit with Rhodes.  (Ellis Dep. at 81.)  Community Bank took as security a 1994 GMC pickup truck and a third mortgage interest in Rhodes' personal residence and other real property.  (Id.)  Community Bank obtained a first lien on the truck.  (Id. at 82.)  According to the deposition testimony of Ellis, when Ellis asked Rhodes about any assets that could be used as security, Rhodes did not indicate to him that Fox & Redmon planned to obtain a lien on the truck.  (Id.)  Community Bank later sold the truck and applied the proceeds from the sale to Rhodes's debt.  (Id. at 83.)

---

[9]The Southwood account at Community Bank is the account into which Rhodes deposited the checks bearing the forged signature of Fox.  This corporate account had a negative balance during several of the months relevant to the instant action.  For example, the first forged check, presented to and paid by Community Bank in November 1997, was made payable to Southwood and was deposited into Southwood's corporate account at Community Bank.  Ellis testified that if those funds had not been deposited into the Southwood account, then that account would have been overdrawn.  (Ellis Dep. at 78-79.)

## II.  ANALYSIS

As a general rule, banks owe their customers a strict duty to pay only authorized and properly payable items on their customers' accounts.  A check is not properly payable if the drawer's signature is forged and/or unauthorized.  This general rule flows from the rationale that banks bear the responsibility of knowing the signatures of their customers.  The drafters of the Uniform Commercial Code ("UCC") recognized, however, that in a society where millions of checks are processed daily, rapid identification by banks of forgeries is virtually impossible. The UCC drafters saw the need to adopt rules that allocated the risks of forgery in a manner that facilitated the processing of volumes of checks in the quickest fashion.  Section 4-406 of the UCC serves as such a rule; it is an exception to the general rule that a bank will be liable to a customer for paying checks on which the customer's signature is forged.  This exception provides a defense to banks when they send account statements to a customer and when the customer fails to promptly examine the statements and notify the bank of any unauthorized payments. This defense does not immunize banks from liability, however. Section 4-406 and Ala. Code § 7-4-406 provide an exception to the exception: banks will be held liable if they fail to pay the forged checks in good faith and fail to exercise ordinary care.

8

    A.    The duties of Fox & Redmon to exercise reasonable promptness in examining the account statement and to notify Community Bank of unauthorized payments.

Section 7-4-406(c) states:

If a bank sends or makes available a statement of account or items pursuant to subsection (a), the customer must exercise reasonable promptness in examining the statement . . . to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized.  If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.

Ala. Code § 7-4-406 (1997).  Section 7-1-201(38) of the Alabama Code defines "send," when used "in connection with any writing or notice," as "to deposit in the mail or deliver for transmission by any other usual means of communication with postage or cost of transmission provided for and properly addressed."  Ala. Code § 7-1-201(38) (Supp. 2001).  No definition is provided in the statutes for the terms "reasonable promptness" or "promptly."  One commentator has stated, however, that "'[p]romptness' is used as a diluted version of 'immediately' or 'as soon as possible' and suggests that the action that must be prompt must be taken as soon as it reasonably can be done."  Ronald A. Anderson & Lary Lawrence, *Uniform Commercial Code*, § 4-406:102 (3d ed., rev. vol. 2000).

    Neither party disputes that Community Bank mailed the statements to Rhodes at the post office box address in

9

Cleveland--the address noted in the Account Agreement as the address to which the account statements should be mailed.  The Account Agreement did not require statements to be mailed to Fox, and Fox never requested Community Bank to send statements to him. Under § 7-1-201(38), Community Bank sent or made available the statements when it mailed them to Rhodes.  And by such action, Community Bank triggered the duties of Fox & Redmon to exercise reasonable promptness in examining the statements and to promptly notify Community Bank of any unauthorized payments.

The first forged check was presented to Community Bank on November 12, 1997, and payment of this check was noted in the account statement covering the period from October 21, 1997 to November 19, 1997.  The other four forged checks were presented between March 16, 1998 and May 9, 1998.  The payment of those checks was reflected in statements dated March 19, 1998 to April 21, 1998, and April 21, 1998 to May 21, 1998.  Fox did not notify Community Bank regarding the initial or the subsequent forgeries until June 30, 1998.  Consequently, under § 7-4-406(c), Fox did not notify Community Bank promptly of the first forged check. Moreover, Fox did not comply with the Account Agreement which required him to notify Community Bank of any unauthorized signatures within 14 days of Community Bank sending the statement.

10

Fox & Redmon argue that Fox's failure to comply with subsection (c) and the Account Agreement (i.e., his delay in notifying Community Bank of the forgeries) can be attributed to Community Bank's failure to send the statements to Fox. In other words, they argue that Community Bank did not make the statements available to Fox by sending the statements to the post office box address.  Regardless of the literal accuracy of the assertion that Community Bank did not make available the statements to Fox when Community Bank mailed the statements regarding the joint account to Rhodes at the Cleveland post office box, the argument of Fox & Redmon fails.

In Anderson's treatise on the UCC, he states that "the fact that the performance [of examining the bank statement] is delegated does not free the customer of the consequences of the performance by the delegee, nor free the customer from responsibility for supervising the delegee." Anderson, *supra* § 4-406:103.  Under the reasoning of Anderson, with which this court agrees, courts should not look to the conduct of third parties when deciding whether the customer promptly examined his bank statements and promptly notified the bank of any unauthorized payments.

> "The modern UCC case law of other jurisdictions is virtually unanimous in holding that, once account statements are mailed to the account holder's proper address, the risk of nonreceipt falls on the account holder and interception of the statements by a wrongdoer does not relieve the account holder of the

11

duty to examine the statements and report unauthorized
items to the bank."

*Borowski v. Firstar Bank Milwaukee*, N.A., 579 N.W.2d 247, 250

(Wis. Ct. App. 1998) (quoting *Stowell v. Cloquet Co-op Credit*

*Union*, 557 N.W.2d 567, 571-72 (Minn. 1997).  Thus, courts have

refused to relieve the customer of the duty to examine account

statements in situations where third parties are at fault and

have, as a practical matter, prevented the customer from

fulfilling his duty.  Recognizing that § 4-406(c) provides that

the duty to notify is triggered if the customer should reasonably

have discovered the unauthorized payment based on the statements

provided, courts have carried the logic of Anderson and the

*Borowski* court even further:

> "A depositor cannot be charged with the knowledge which
> the dishonest employee has gained while he was stealing
> from him . . . but a depositor must be held chargeable
> with knowledge of all the facts that a reasonable and
> prudent examination of the returned bank statements,
> vouchers and certificates would have disclosed had it
> been made by a person on the depositor's behalf who had
> not participated in the forgeries."

*Faber v. Edgewater National Bank*, 244 A.2d 339, 343 (N.J. Super.

Ct. 1968) (quoting *Screenland Magazine v. National City Bank*, 42

N.Y.S.2d 286, 289 (N.Y. Sup. Ct. 1943)) (omission in original).

Alabama courts have followed this reasoning and have refused

to excuse a customer from timely performing his § 7-4-406(c)

duties by relying upon an employee to whom those duties were

assigned. The Alabama Supreme Court, in *Southern Guaranty*

12

*Insurance Co. v. First Alabama Bank*, 540 So. 2d 732 (Ala. 1989), held that the plaintiff bank customer failed to fulfill her duties to examine the statement and notify the bank of unauthorized statements with reasonable promptness.  In *Southern Guaranty*, the bank customer hired a bookkeeper to work on its payroll account, maintain the payables checkbook, and keep the general ledger.  *Id.* at 733-34.  The bookkeeper was solely responsible for reviewing the bank statements and cancelled checks and for reconciling the bank statements with the checking and payroll records.  *Id.* at 733-34.  The court held that "[t]his evidence is sufficient to warrant the conclusion that [the customer] failed to exercise reasonable care as required under [§ 7-4-406(c)]."  *Id.* (citations omitted).

A similar conclusion was reached by the Alabama Court of Civil Appeals in *Industrial Systems of Huntsville v. American National Bank of Huntsville, N.A.*, 376 So. 2d 742 (Ala. Civ. App. 1979).  In *Industrial Systems*, the court held that the plaintiff bank customer "totally failed to exercise reasonable care and promptness in examining the cancelled checks and bank statements forwarded to plaintiff by defendant bank."  *Id.* at 744.  The court reached this conclusion by looking to the following facts: (1) plaintiff admitted that he received the bank statements and cancelled checks each month; (2) plaintiff's bookkeeper, who was responsible for the forgeries, was the only person who examined

13

the bank statements during the relevant time period; and (3) no one other than the bookkeeper had the responsibility to reconcile plaintiff's bank statements. *Id.* at 744.

Fox appears to have shared the responsibility for reviewing the account statements with Rhodes by requesting Rhodes to send him a copy of the statements. Under the reasoning of Anderson, the *Borowski* and *Faber* courts, and the holdings of *Southern Guaranty* and *Industrial Systems*, however, this kind of sharing arrangement is not sufficient to excuse Fox's failure to notify Community Bank until six months after the first forged check was paid. Fox & Redmon must bear the consequences of Fox's failure to at least occasionally monitor the joint account in a somewhat independent manner. Fox should have, at least once, reviewed the checks that were sent with the statements, asked Community Bank for copies of the bank statements, asked for copies of the check register in Rhodes's possession, or sought to have someone other than Rhodes reconcile the statements.

Furthermore, a review of the actual statements sent by Rhodes to Fox should have prompted Fox to seek some sort of independent review of the statements and the joint account. From the copies provided to the court, Fox received from Rhodes four statements, covering statement periods beginning on May 20, 1997 and ending on August 20, 1997; those statements appear to be the authentic statements from Community Bank and appear to contain no

14

alterations.  However, the format of the statements received by
Fox from Rhodes and the actual quality of those copies changed
beginning with the statement for August 20, 1997 to September 21,
1997.  The court finds that such change should have caused Fox to
use some mechanism to verify the authenticity of the statements
and the accuracy of the contents reflected therein.  Furthermore,
following the *Faber* court's reasoning that the knowledge
contained in the statements reviewed by the wrongdoer should be
imputed to the customer who entrusted the wrongdoer with the duty
of reviewing the statements, the court finds that Fox & Redmon
should have reasonably discovered the unauthorized payments.

Because there were multiple checks forged on the joint
account, and because each of those checks were forged by Rhodes,
§ 7-4-406(d) of the Alabama Code is also triggered.  Subsection
(d) explains the duties imposed upon Fox & Redmon more fully and
provides that

> [i]f the bank proves that the customer failed, with
> respect to an item, to comply with the duties imposed
> on the customer by subsection (c), the customer is
> precluded from asserting against the bank: [t]he
> customer's unauthorized signature or any alteration on
> the item if the bank also proves that it suffered a
> loss by reason of the failure; and (2) [t]he customer's
> unauthorized signature or alteration by the same
> wrongdoer on any other item paid in good faith by the
> bank if the payment was made before the bank received
> notice from the customer of the unauthorized signature
> or alteration and after the customer had been afforded
> a reasonable period of time, not exceeding 30 days, in
> which to examine the item or statement of account and
> notify the bank.

Ala. Code § 7-4-406(d) (1997).  As discussed above, this court

finds that Fox & Redmon failed to comply with § 7-4-406(c) by not

promptly examining the bank statements and by not promptly

notifying Community Bank.  Community Bank is thus afforded of the

subsection (d)(2) defense for the subsequent forgeries.[10]  The

last forged check was paid on May 9, 1998, and yet Fox did not

notify Community Bank of the forgeries until June 30, 1998.

Therefore, no argument can be made that Fox notified Community

Bank of the forgeries within thirty days and that he complied

with subsection (d).  As they argued when explaining his

noncompliance with § 7-4-406(c), Fox & Redmon once again argue

that Fox's failure to comply with subsection (d) should be

excused by the wrongdoing of Rhodes.  Again, this court is not

persuaded by the argument of Fox & Redmon.

  This court finds no excuse for Fox's failure to promptly

report the unauthorized checks by blaming it on Rhodes.  Rather,

the court finds that Community Bank sent and/or made available

the statements to Fox; that the duties to promptly examine and

notify were triggered; and that Fox & Redmon failed to fulfill

their statutory and contractual duties by not notifying Community

Bank of the unauthorized payments until six months following the

---

[10]Fox & Redmon seem to assert that the subsection (d) defense is
not available because Community Bank cannot prove, as provided in
subsection (d)(1), that it suffered a loss.  A review of the
statute reveals, however, that there are two **alternative** defenses
provided for in subsection (d), and Community Bank seeks to avail
itself only of the defense embodied in subsection (d)(2).

date the statements were made available to him.  Community Bank
can therefore take advantage of the defense provided in 4-406(d),
and Fox & Redmon are precluded from asserting against Community
Bank the improper payment of the four forged checks that were
subsequently paid by Community Bank from March 1998 to May 1998.
Community Bank's motion for summary judgment will therefore be
granted on the issue of whether Fox & Redmon failed to exercise
reasonable promptness in examining the account statements and
whether Fox & Redmon promptly notified Community Bank of the
forged checks.

    B.    Community Bank's conduct in paying the forged checks.

    Although § 7-4-406(d) regarding the negligence of the
customer operates as a defense for banks when they pay forged
checks, subsection (e) provides an exception to that defense.

> If subsection (d) applies and the customer proves that
> the bank failed to exercise ordinary care in paying the
> item and that the failure substantially contributed to
> the loss, the loss is allocated between the customer
> precluded and the bank asserting the preclusion
> according to the extent to which the failure of the
> customer to comply with subsection (c) and the failure
> of the bank to exercise ordinary care contributed to
> the loss.  If the customer proves that the bank did not
> pay the item in good faith, the preclusion under
> subsection (d) does not apply.

Ala. Code § 7-4-406(e) (1997).  The UCC's Official Comment states
that the term good faith is defined in § 3-103(a)(4) "as
including 'observance of reasonable commercial standards of fair
dealing.'"  Ala. Code § 7-4-406(e) cmt. 4 (1997).  The comment

17

further explains that the term ordinary care does not impose a requirement of sight examination by a payor bank if the payor bank's procedure is reasonable and is commonly followed by other comparable banks in the area. *Id.*

The court recognizes, as explained in the statute's commentary, that visual sight examination of each check is not required because it is infeasible. The court also recognizes that a prima facie case of good faith and ordinary care can be established when a bank proves that it observes reasonable commercial standards that are commonly followed by comparable banks. Nonetheless, this court finds a genuine issue of material fact exists as to this narrow issue.

In its reply brief, Community Bank invited the court to "determine what else, if anything, Community Bank could have possibly done to prevent the forgery of the subject checks by Russell R. Rhodes." (Community Bank's Reply Br. to Pls.' Opp'n Mot. Summ. J. at 1.) This court finds it must allow a jury to answer Community Bank's question. Anderson states in his UCC treatise that "customary banking practices do not constitute the definitive statement of the duty resting upon a bank. It is therefore necessary to determine whether the practices that were followed, whether by the drawee bank alone or by the community of banks generally, constituted reasonable commercial practices." Anderson, *supra* § 4-406:71. Though Community Bank's president,

18

Kevin Ellis, testified that other area banks do not follow a standard procedure to check for forged signatures, the court cannot determine, as a matter of law, that such a state of affairs is reasonable. The court cannot reach this determination because the court's research reveals that in many of the cases where banks have been found to exercise ordinary care and good faith, the banks followed at least **some** procedure to protect against forgeries.[11]

One such case where the defendant's procedures comported with industry usage but failed to reach the ordinary care and good faith standard is *McDowell v. Dallas Teachers Credit Union*, 772 S.W.2d 183 (Tex. Civ. App. 1989). Though the defendant credit union established a prima facie case that it used ordinary care in paying forged drafts because its procedures followed industry standards, the court held that, as a matter of law, the defendant's "failure to establish any process to signature-verify any share drafts was unreasonable, arbitrary, and unfair." *McDowell*, 772 S.W.2d at 190. Similar to the case at hand, the defendant credit union in *McDowell* did not have nor follow a

---

[11] *See Rhode Island Hospital Trust National Bank v. Zapata Corp.*, 848 F.2d 291 (1st Cir. 1988) (affirming a lower court's finding that the defendant bank's practices followed reasonable commercial standards when the bank's ordinary procedures included the examination of all signatures on checks for amounts greater than $1,000 and the random examination of signatures of one percent of checks between $100 and $1,000, and when the the bank provided expert testimony to establish that most banks in the nation follow its practices).

procedure for verifying the signatures on drafts.  *Id.* at 186-
190.  Though this court is unwilling to decide, as did the
McDowell court, that the defendant's procedures are unreasonable
as a matter of law, this court finds that Community Bank's
failure to have **any** procedure for verifying the signatures of its
customers presents a genuine issue of material fact as to whether
it exercised ordinary care and paid the forged checks in good
faith.[12]  On this narrow issue, Community Bank's motion for
summary judgment must be denied and the factual dispute submitted
to a jury.

  C. The timeliness of the notification by Fox & Redmon to
    Community Bank regarding the unauthorized payments.

Section 7-4-406(f) of the Alabama Code provides:

> Without regard to care or lack of care of either the
> customer or the bank, a customer who does not within
> 180 days after the statement and the items or a legible
> copy or image of the items are sent to the customer, or
> within one year after the statement or items are
> otherwise made available to the customer discover and
> report the customer's unauthorized signature on or any
> alteration on the item is precluded from asserting
> against the bank the unauthorized signature or
> alteration.

Ala. Code § 7-4-406(f) (1997) (parenthetical omitted).  The
Alabama Comment to subsection (f) states that the

> notice requirements in subsection (f) are the periods
> within which the customer must notify the drawee bank

---

[12]In reaching its holding, the *McDowell* court noted that many
cases typically state that questions of whether a defendant bank
exercised ordinary care is typically a question of fact to be
resolved by the fact-finder.  *McDowell*, 772 S.W.2d at 190, n.4
(citations omitted).

> of the fraud or be absolutely barred from recovery.
> These notice requirements are in the nature of a
> statute of repose for reporting unauthorized signatures
> or alterations rather than a measure of time within
> which a suit to re-credit the account must be brought
> (a statute of limitations).

Ala. Code § 7-4-406(f) Ala. cmt. (1997).

The first statement reflecting the payment of the first

forged check was dated October 21, 1997 to November 19, 1997.  By

June 30, 1998, when Fox notified Community Bank of the forgeries,

more than 180 days had elapsed since the statements were sent to

the Cleveland post office box address.  Fox & Redmon are

therefore barred from recovering from Community Bank on the first

forged check.[13]  Payment of the other forged checks was reflected

in statements dated March 19, 1998 to April 21, 1998, and April

21, 1998 to May 21, 1998.  Consequently, 180 days had not passed

by June 30, 1998, when Fox notified Community Bank of the

forgeries.  Under § 7-4-406(f), Fox & Redmon are not barred from

recovering from Community Bank for the payment of the last four

forged checks.

Community Bank argues that, for purposes of the time bar

under subsection (f), Fox did not notify Community Bank until

October 9, 1998, when Fox & Redmon made the first formal demand

---

[13]The one year period discussed in § 7-4-406(f) does not save the
claims of Fox & Redmon regarding the first forged check because
the Alabama Comment explains that this period applies to
situations where the bank *sends only the account statements*
without the accompanying cancelled checks.  *See* Ala. Code § 7-4-
406(f) Ala. cmt. (1997).

for payment.   The court cannot find any language in the statute that requires the customer to do more than notify the bank of the fraud.   Thus, this argument by Community Bank fails.

Subsection (f), however, does not provide the only obstacle for Fox & Redmon.   The Account Agreement narrows the time limit during which customers are required to report unauthorized payments or otherwise be forever barred from asserting such claims against Community Bank to sixty days.   Consequently, the claims of Fox & Redmon regarding the first two forged checks would be time-barred because they did not notify Community Bank within sixty days when those statements were dated October 21, 1997 to November 19, 1997, and March 19, 1998 to April 21, 1998, respectively.

Thus, insofar as Community Bank's motion argues that summary judgment should be granted in its favor because the claims of Fox & Redmon are time-barred under § 7-4-406(f), Community Bank's motion will be denied, except as it pertains to the first and second forged checks.

D.   The claim by Fox & Redmon for tortious interference
     with business relations.

Rhodes gave Fox & Redmon liens on various properties as partial repayment of the amounts contained in the forged checks. Fox & Redmon foreclosed on those properties to recoup their losses.   Fox & Redmon claim that Community Bank knew of the agreement between Fox and Rhodes regarding the pledging of those

22

assets and that it induced Rhodes into breaching the agreement so
that Community Bank could obtain a lien on a vehicle owned by
Rhodes.  Fox, relying upon the information conveyed to him from
Rhodes, testified in his deposition that Rhodes furnished a copy
of the aforementioned agreement to Community Bank when the bank
pursued the assets of Rhodes as it sought to secure the unsecured
loan on which Rhodes was indebted.  Ellis, however, testified
that he did not know of any agreement between Fox and Rhodes
regarding the pledging of this vehicle.  Though there is
obviously a disputed fact as to whether Community Bank received a
copy of the Fox-Rhodes agreement regarding the pledging of
assets, this fact alone is not sufficient to justify denying
Community Bank's summary judgment on this tort claim.

The tort of interference with business relations requires a
showing of the following elements:

> (1) The existence of a contract or business relation;
> (2) Defendant's knowledge of the contract or business
> relation;
> (3) Intentional interference by the defendant with the
> contract or business relation;
> (4) Absence of justification for the defendant's
> interference; and
> (5) Damage to the plaintiff as a result of defendant's
> interference.

*Sevier Insurance Agency, Inc. v. Willis Corroon Corp. of
Birmingham*, 711 So. 2d 995 (Ala. 1998).  No evidence before the
court demonstrates the existence of an agreement or business
relation between Fox and Rhodes regarding the pledging of

23

Rhodes's assets other than the testimony of Fox about Rhodes's transmission of the fact of an oral agreement to Community Bank.[14]  Assuming that such an agreement or business relation existed, there is no evidence to suggest that Community Bank intentionally interfered with this agreement or relationship. Thus, there is insufficient evidence for the court to find that such an agreement exists.  Because the first and third elements of this tort are not satisfied, the court will grant Community Bank's motion for summary judgment on the tortious interference with business relations claim.

    E.   Community Bank's claim for a setoff of damages.

    As noted in the previous section, Fox & Redmon have recouped some of their losses by foreclosing on properties formerly owned by Rhodes.  Community Bank argues that it is entitled to partial summary judgment regarding the amount of damages claimed because the amounts received by Fox & Redmon from the foreclosures should be credited against the damages sought by Fox & Redmon in this action.  This argument is not supported, however, by evidence and consequently, the court cannot grant partial summary judgment in

---

[14]It is worth noting that the brief of Fox & Redmon in opposition to the summary judgment motion makes no argument regarding the legitimacy of this tort claim or regarding the evidence supporting this claim.  The brief merely states: "Plaintiffs also assert in Count III a claim for tortious interference by Community Bank in an agreement between Plaintiffs and Mr. Rhodes regarding an effort to repay this obligation. Community Bank did not address this claim in their motion."  (Pls.' Br. Opp'n Community Bank's Mot. Summ. J. at 3.)

favor of Community Bank on this issue, which will remain for trial.

III.   CONCLUSION

The court will enter a separate order consistent with the foregoing analysis.

DONE this _____ day of February 2002.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE